**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**GENESIS HEALTHCARE SYSTEM,**

**PLAINTIFF,** **CIVIL ACTION NO. 2:26-cv-1267**

**V.**

**AETNA HEALTH INC.,**

**DEFENDANT.**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Genesis HealthCare System ("Genesis" or "Hospital"), by and through its undersigned counsel, by way of Complaint for Declaratory and Injunctive Relief against the Defendant Aetna Health Inc. ("Aetna" or "Defendant"), alleges as follows:

## INTRODUCTION

1. This is an action to enforce federal law. Aetna., a Medicare Advantage organization, has implemented and is applying its "Level of Severity Inpatient Payment Policy" (the "Policy") in violation of the federal Two Midnight Rule, 42 C.F.R. § 412.3, and the coverage and payment requirements of 42 C.F.R. § 422.101. By applying proprietary MCG-based "severity" criteria that are more restrictive than the federal Two Midnight Rule to reduce payments for medically necessary inpatient admissions, Aetna has violated, and continues to violate, its obligations under federal Medicare Advantage law, which prohibits Medicare Advantage organizations from applying coverage or payment criteria more restrictive than those established under Traditional Medicare.

2. Beginning on January 1, 2026, pursuant to the Policy, Aetna has engaged in systematic violations of federal law by "authorizing" inpatient admissions that satisfy the Two Midnight Rule while simultaneously reducing payment to an observation-comparable rate based on Aetna's proprietary "level of severity" criteria. The Centers for Medicare & Medicaid Services ("CMS") has unequivocally stated that "MA plans may not use InterQual or MCG criteria, or similar products, to change coverage or payment criteria already established under Traditional Medicare laws." 88 Fed. Reg. 22,120, 22,194 (Apr. 12, 2023). Aetna's Policy does exactly what federal law prohibits.

3. Since 1997, federal law has required Medicare Advantage organizations to provide coverage of all items and services covered by Medicare Part A and Part B. 42 U.S.C. § 1395w-22(a)(1). Under 42 C.F.R. § 422.101, Medicare Advantage organizations must provide "benefits" through "payment" for all services covered by Traditional Medicare. The Two Midnight Rule, 42 C.F.R. § 412.3(d)(1), defines when an inpatient admission is appropriate for payment under Medicare Part A: when the admitting physician expects the patient to require hospital care that crosses two midnights. Aetna's Policy violates these federal requirements by imposing proprietary MCG "severity" criteria that deny full inpatient payment for admissions that satisfy the Two Midnight Rule.

4. Aetna's Policy denies full contractual payment for inpatient services that Genesis provides to Aetna's Medicare Advantage members, services that the Two Midnight Rule defines as inpatient services. While Aetna purports to "authorize" inpatient stays (and thus does not issue a formal coverage denial), Aetna applies its proprietary MCG-based "severity" criteria to reduce payment to a lower rate if the stay does not meet Aetna's self-created threshold. As CMS has explained, it is irrelevant whether a restriction is labeled a "coverage rule" or a "payment rule;"

both address the scope of items and services for which benefits are available under Parts A and B. 88 Fed. Reg. at 22,191-92. Aetna cannot do indirectly through a "payment" mechanism what federal law prohibits it from doing directly through a "coverage" determination.

5. In addition to violating federal law, Aetna's conduct also breaches the parties' Agreement. The parties' Hospital Services Agreement requires Aetna to remain "substantially in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided hereunder." Aetna's violation of the Two Midnight Rule and 42 C.F.R. § 422.101 therefore constitutes a breach of this material contractual obligation. Moreover, the Agreement's amendment provisions do not authorize Aetna to impose a policy that itself violates federal law, nor do they authorize a unilateral change to negotiated reimbursement rates untethered to any legal or regulatory mandate.

6. Genesis is not alone in confronting this unlawful practice. In *Thomas Jefferson University d/b/a Jefferson Health, et al. v. Aetna Health Inc.*, No. 5:26-cv-02215-JMG (E.D. Pa., filed Apr. 6, 2026), another hospital system filed a materially identical challenge to the same Aetna Level of Severity Inpatient Payment Policy, alleging that the Policy violates the Two Midnight Rule. The American Hospital Association and Hospital Association of Pennsylvania have sought leave to file an amicus curiae brief in that action, emphasizing that Aetna's Policy violates federal law by applying MCG criteria to "change coverage or payment criteria already established under Traditional Medicare laws," underscoring the nationwide significance of the federal law issues presented. Aetna's Policy is not a localized contract dispute; it is a systematic, national effort by a major Medicare Advantage insurer to circumvent federal Medicare Advantage law.

7. Genesis seeks declaratory and injunctive relief, as well as damages.

## THE PARTIES

8. Plaintiff Genesis HealthCare System ("Genesis") is an Ohio nonprofit healthcare system with its principal place of business at 2951 Maple Ave., Zanesville, Ohio 43701. Genesis is a vital provider of inpatient, emergency, and specialty hospital services in southeastern Ohio, serving communities across Muskingum County and the surrounding region. Genesis is CMS 5-Star rated and has been recognized as a Top 100 Hospital (2022–2024) and a Top Heart Hospital (2023–2024).

9. On information and belief, Defendant Aetna is a Pennsylvania corporation with its principal place of business at 1425 Union Meeting Road, Blue Bell, Pennsylvania 19422. On information and belief, Aetna issues and administers health insurance plans, including Medicare Advantage plans, and is licensed to conduct health insurance business in Ohio. On information and belief, Aetna may be served with process through its registered agent for service of process in Ohio, CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

10. On information and belief, Aetna operates Medicare Advantage plans in Ohio and contracts with Ohio hospitals, including Genesis, for the provision of inpatient and outpatient hospital services to Aetna's Medicare Advantage members.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 (federal question). This action arises under federal Medicare Advantage law, specifically the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101, which govern the coverage and payment criteria that Medicare Advantage organizations must apply to inpatient admissions. Genesis seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 to enforce Aetna's compliance with these federal regulations. Genesis's state-law breach of contract claim,

which is derivative of and dependent upon the federal law claim, falls within this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

12. This Court additionally has jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship) because Genesis is a citizen of Ohio (its state of incorporation and principal place of business) and Aetna is a citizen of Pennsylvania (its state of incorporation and principal place of business), and the amount in controversy exceeds $75,000, exclusive of interest and costs, based on the value of the prospective relief and equitable restitution sought.

13. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy under Article III of the Constitution.

14. This Court has personal jurisdiction over Aetna because Aetna regularly conducts business in Ohio, is licensed to sell Medicare Advantage and other health insurance in Ohio, contracts with Ohio hospitals including Genesis for the provision of hospital services, and has directed the conduct at issue (the unilateral implementation of the Policy) toward Genesis in Ohio.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district. Genesis's hospitals and administrative offices are located in Zanesville, Ohio, within the Southern District of Ohio, Eastern Division. Aetna conducts substantial business in this district, and Aetna's Medicare Advantage members and network hospitals are located within this district.

## FACTUAL ALLEGATIONS

### *I. The Agreement and Its Incorporation of Federal Law*

16. Effective January 1, 2009, Aetna Health Inc., a Pennsylvania corporation, on behalf of itself and its Affiliates ("Company"), and Genesis HealthCare System ("Hospital") entered into a written Hospital Services Agreement (the "2009 Hospital Agreement").

17. The 2009 Hospital Agreement has been amended and supplemented over time, including by a 2010 Medicare Amendment (effective January 1, 2010), a September 2010 Notice of Material Amendment, an August 15, 2011 Amendment, an October 15, 2015 Amendment, a February 2024 Business Associate Agreement, a May 2025 Electronic Access to Medical Records Amendment (CR 107), and other related amendments and addenda (collectively, the "Agreement").

18. Pursuant to Section 3.2(c) of the Agreement, Aetna represents and warrants that it "is, and will remain throughout the term of this Agreement, substantially in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided hereunder." This provision incorporates federal Medicare Advantage law, including the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101, as material terms of the parties' Agreement. Aetna's compliance with federal law is not merely a regulatory obligation; it is a binding contractual commitment.

19. Pursuant to Section 2.3.1(b) of the Agreement, Genesis must similarly remain in compliance with applicable federal and state law. Compliance with applicable federal law, including the Two Midnight Rule and 42 C.F.R. § 422.101, is therefore a reciprocal and material term of the parties' Agreement. The parties' mutual obligation to comply with federal law is central to the bargain they struck.

20. Pursuant to Section 4.1.3 of the Agreement (Utilization Management), Aetna "reserves the right to perform utilization management (including retrospective review) and to adjust or deny payment for the inefficient delivery of Hospital Services related to admissions, or length of stay," but Aetna agrees not to conduct retrospective review so long as Aetna was afforded a reasonable opportunity to conduct full concurrent utilization management review while the Member was hospitalized.

21. Pursuant to Section 9.1 of the Agreement (Amendments), "no changes, amendments or alterations shall be effective unless signed by both Parties," except that Aetna may unilaterally amend upon written notice to comply with applicable law or regulation, or any order or directive of a governmental agency. This exception does not authorize Aetna to impose a policy that itself violates federal law, nor does it authorize a unilateral change to negotiated reimbursement rates untethered to any legal or regulatory mandate.

22. Under Section 9.1, non-material changes require fifteen (15) days' notice. Material Changes (defined in Section 1.28 as changes reasonably expected to have a material adverse impact on Hospital's reimbursement or administration) require ninety (90) days' notice as a "Notice of Material Amendment to Contract." If Hospital timely objects and the objection is unresolved, either party may terminate the Agreement. The amendment provision does not contemplate Aetna simply overriding Hospital's objection and unilaterally imposing the change.

23. An Aetna Policy that violates federal law—including the LOS Policy's use of proprietary MCG-based criteria to reduce payment for admissions satisfying the Two Midnight Rule—is not a "Policy" that Hospital is contractually obligated to accept.

24. The Agreement's compensation schedules set specific reimbursement rates for inpatient hospital services based on DRG/Medicare Allowable methodology: a single negotiated

rate for a given inpatient DRG, not a bifurcated "higher" and "lower" severity rate depending on Aetna's post hoc severity determination.

25. Pursuant to Section 8.2 of the Agreement (Provider Dispute Resolution), Aetna is required to maintain an internal mechanism for Hospital to raise issues, concerns, controversies, or claims regarding the parties' obligations under the Agreement. Hospital must exhaust this internal mechanism before instituting arbitration or other permitted legal proceedings.

26. Pursuant to Section 8.3.1 of the Agreement (Arbitration), any controversy or claim arising out of or relating to the Agreement or the breach, termination, or validity thereof, "except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration administered by the American Arbitration Association." The Agreement further provides in Section 8.3.5 that "the arbitrator may award only monetary relief" and is not empowered to award damages other than compensatory damages and, in the arbitrator's discretion, pre-award interest. Read together, these provisions confirm that the parties intended equitable claims—including claims seeking injunctive or other equitable relief—to be resolved by a court, not by an arbitrator limited to monetary relief. The equitable-relief language is a true exemption from arbitration: it excludes controversies or claims seeking equitable relief from the arbitration mandate, rather than merely preserving a right to seek relief in aid of an arbitrator's antecedent decision.

27. Section 9.3 of the Agreement provides that Ohio law governs the Agreement in all respects.

## ***II. <u>The CMS Two Midnight Rule and Federal Medicare Advantage Requirements</u>***

28. The Two Midnight Rule and related federal regulations are at the heart of this dispute. Since 1997, federal law has required Medicare Advantage organizations that contract with

CMS to offer Medicare Advantage plans to provide their enrollees with benefits no less favorable than those available under traditional fee-for-service Medicare, including Part A inpatient hospital benefits. 42 U.S.C. § 1395w-22(a)(1). This statutory mandate is foundational to the Medicare Advantage program.

29. Under 42 C.F.R. § 422.101, Medicare Advantage organizations are required to provide "coverage of, through provision of or payment for, all services that are covered by Part A and Part B of Medicare," and must comply with CMS's national coverage determinations and general coverage and benefit conditions included in Traditional Medicare law. Thus, from the start, Medicare Advantage plans have had to provide "benefits" through "payment" for all services that are "covered" by Medicare Part A. Payment is the mechanism by which Medicare Advantage organizations provide the required coverage.

30. Effective 2013, CMS promulgated the Two Midnight Rule, codified at 42 C.F.R. § 412.3(d)(1), which provides that "an inpatient admission is generally appropriate for payment under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights," based on factors including patient history and comorbidities, severity of signs and symptoms, current medical needs, and risk of an adverse event. The Two Midnight Rule is a Medicare coverage criterion that defines when inpatient services are covered by Medicare Part A. Once CMS created the Two Midnight Rule to define hospital inpatient benefits under Part A, the Two Midnight Rule became binding on Medicare Advantage plans pursuant to Congress's original 1997 directives and CMS's regulations at § 422.101.

31. On April 12, 2023, CMS promulgated the 2023 Final Rule, in which CMS reaffirmed "its longstanding policy that MA organizations may only apply coverage criteria that are no more restrictive than Traditional Medicare coverage criteria." 88 Fed. Reg. 22,120, 22,189

(Apr. 12, 2023). This prohibition is absolute: Medicare Advantage organizations may not substitute more restrictive standards, whether those standards are labeled "coverage criteria" or "payment criteria."

32. The 2023 Final Rule specifically addresses the issue presented in this case. CMS confirmed that the Two Midnight Rule is a Medicare coverage criterion applicable to inpatient determinations, and that "MA plans may not use InterQual or MCG criteria, or similar products, to change coverage or payment criteria already established under Traditional Medicare laws." 88 Fed. Reg. at 22,194. This statement directly prohibits Aetna's Level of Severity Policy, which uses MCG criteria to reduce payment for inpatient admissions that satisfy the Two Midnight Rule.

33. CMS has explained that it is irrelevant whether a restriction is labeled a "coverage rule" or a "payment rule": "[w]hen determining whether Traditional Medicare criteria apply in MA, it is irrelevant whether Traditional Medicare considers the criteria part of a coverage rule or a payment rule, as both address the scope of items and services for which benefits are available to Medicare beneficiaries under Parts A and B." 88 Fed. Reg. at 22,191–92. Aetna's characterization of the Policy as a "payment policy" rather than a "coverage policy" is therefore legally irrelevant. The Policy applies MCG criteria to reduce payment for inpatient admissions that satisfy the Two Midnight Rule, and that is precisely what federal law prohibits.

34. 42 U.S.C. § 1395w-24(a)(6)(B)(iii), the Medicare Act's Non-Interference Clause, constrains CMS; it does not constrain hospitals or confer on Medicare Advantage organizations affirmative authority to override federal coverage standards. The clause prohibits CMS from requiring a "particular pricing structure for payment" under a private Medicare Advantage organization-provider contract, but Aetna's privately negotiated price structure must still operate within the baseline requirement that a Medicare Advantage organization provide benefits "no less

favorable" than Traditional Medicare, including payment for services covered under Part A and the Two Midnight benchmark. CMS's statement that it will not dictate price structures addresses regulatory micromanagement of contract rates—not a license for Medicare Advantage organizations to circumvent federal coverage rules or use private payment labels to narrow federally required benefits. The Non-Interference Clause therefore does not permit Aetna to structure a payment policy that functions as a de facto coverage restriction by paying an observation-comparable rate for inpatient admissions that satisfy the Two Midnight Rule's coverage benchmark. Aetna cannot use the clause as a safe harbor for a policy that changes the scope of covered inpatient benefits or imposes a more restrictive standard than Traditional Medicare.

### ***III. Aetna's "Level of Severity Inpatient Payment Policy" Violates Federal Law***

35. Aetna's Level of Severity Inpatient Payment Policy (the "Policy") violates the Two Midnight Rule and 42 C.F.R. § 422.101 on its face. The Policy applies to Medicare Advantage and Special Needs Plan (SNP) urgent and emergent inpatient admissions of one (1) or more midnights, for providers (including Genesis) that are paid on a DRG/Medicare Allowable basis. By its terms, the Policy applies MCG-based criteria that are more restrictive than the Two Midnight Rule to reduce payment for medically necessary inpatient admissions.

36. Under the Policy, for inpatient stays of at least one (1) but less than five (5) midnights, Aetna "authorizes" the inpatient admission (so it does not deny coverage outright) but performs a "level of severity review" using Aetna's proprietary MCG-based severity criteria. If the stay does not meet Aetna's severity criteria, Aetna pays a "lower level of severity rate" comparable to an outpatient observation rate, rather than the negotiated inpatient DRG rate. If the stay meets the severity criteria, Aetna pays the "higher level of severity rate" (i.e., the negotiated

inpatient DRG rate). For stays of five (5) midnights or more, Aetna pays the higher inpatient rate without a severity review. This scheme allows Aetna to apply criteria more restrictive than the Two Midnight Rule while avoiding the formal denial procedures that would trigger CMS-mandated administrative appeal and peer-to-peer review rights.

37. Aetna represents that the severity criteria are "not used to determine whether an inpatient stay is medically necessary," but rather are used only to determine the payment rate. This distinction is immaterial under federal law. CMS has explained that whether a criterion is labeled a "coverage" criterion or a "payment" criterion, both address the scope of items and services for which benefits are available. Moreover, MCG (the clinical criteria vendor) does not publish separate "severity of inpatient admission" criteria. "Severity" as used in the Policy is a concept invented by Aetna and is not a recognized Two Midnight Rule concept, nor is it a CMS-approved coverage or payment criterion. Aetna is applying inpatient screening criteria for an entirely different purpose than that for which the criteria were designed.

38. The practical effect of the Policy is to allow Aetna to violate the Two Midnight Rule while avoiding federal oversight. By "authorizing" inpatient admissions (rather than issuing formal medical-necessity denials), Aetna avoids triggering CMS-mandated administrative appeal and peer-to-peer review rights, while nonetheless reducing payment for medically necessary inpatient admissions to observation-level rates. The Policy thus functions as a de facto coverage denial disguised as a "payment" determination. This is precisely the conduct that CMS prohibited when it stated that "MA plans may not use InterQual or MCG criteria, or similar products, to change coverage or payment criteria already established under Traditional Medicare laws." 88 Fed. Reg. at 22,194.

39. Aetna may attempt to characterize the Policy as provider-friendly because it "authorizes" admissions and pays something on claims that Aetna previously denied. That characterization simply redefines the baseline. For admissions satisfying the Two Midnight Rule, Genesis is entitled under federal law and the Agreement to the full contracted inpatient DRG payment; claims that were previously denied because they met no valid inpatient standard should not have been denied in the first place. Aetna cannot convert its prior unlawful denial practice into a "benefit" by paying a partial amount and calling the resulting shortfall a lower level of severity rate.

40. Nor does the Policy's promise of "faster payment" benefit Genesis when the faster payment is materially reduced—often to an observation-comparable amount—for an admission that qualifies for full inpatient payment. The Policy's purported process protections—pre-claim review, discussions with an Aetna medical director, and post-claim appeals—impose additional administrative work on Genesis and do not provide the CMS-mandated administrative appeal and peer-to-peer review rights that a formal coverage denial would trigger. Aetna cannot evade those protections by authorizing the admission on paper while reducing payment in practice.

### ***IV. The Parties' Dispute and Genesis's Efforts to Resolve It***

41. Aetna first communicated the Policy to Genesis via a "90-Day Notice" in Aetna's August 2025 Office Link Update, targeting a November 15, 2025 effective date. The notice contemplated a new two-tier payment approach for urgent and emergent inpatient admissions. Aetna did not negotiate the Policy with Genesis or seek Genesis's consent before announcing it.

42. Between October 1, 2025 and November 6, 2025, Genesis's Chief Population Health Officer, Linda Supplee, RN, MHA, CCM, FACHE, corresponded with Aetna Network Manager Sabrina Picard as part of a good-faith effort to understand and resolve the dispute.

Genesis requested detailed information about the MCG "supplemental" criteria Aetna intended to apply, noted that those criteria appeared to differ from the standard MCG criteria Genesis already uses to determine inpatient-versus-observation status, and provided examples in which Genesis's application of MCG criteria supported inpatient status but Aetna nonetheless denied or downgraded the claim. Genesis also sought an explanation of how the proposed criteria could be reconciled with the Two Midnight Rule, the Agreement's negotiated rates, and Genesis's clinical processes.

43. On October 31, 2025, Genesis's leadership participated in good-faith discussions with Aetna at a Joint Operating Committee ("JOC") meeting and presented detailed financial and operational data. Genesis presented data concerning its 2025 Aetna Medicare Advantage admissions and readmissions, the resulting shortfall in payment, Aetna's observation-downgrade rate compared with peer payers, the approximately $18.6 million in disputed revenue tied to Aetna contracts, the approximately $3,558 average cost of each appeal, and case studies showing the clinical and financial consequences of Aetna's denial and downgrade practices. Genesis warned that the incoming Level of Severity Policy would compound these harms.

44. On November 11, 2025, Aetna informed Genesis via its November Office Link Update that the Policy's effective date had been moved to January 1, 2026. Genesis continued to seek clarification and a negotiated resolution rather than accept the Policy's unilateral application.

45. On November 26, 2025, Genesis sent Aetna a formal written objection via certified mail and email, captioned "FORMAL OBJECTION TO UNILATERAL AMENDMENT (AETNA LEVEL OF SEVERITY INPATIENT PAYMENT POLICY)." Genesis's objection specifically identified the Policy as violating the Two Midnight Rule and applicable federal coverage and payment requirements, constituting a material adverse change to the Agreement,

breaching the Agreement's negotiated inpatient reimbursement schedule, and imposing a de facto retrospective payment reduction without a formal medical-necessity denial. Genesis also explained the disproportionate financial harm to Genesis as a rural, thin-margin hospital, demanded written confirmation that it was exempt from the Policy within fifteen (15) business days, and sought meaningful negotiation of an exemption or other appropriate modification.

46. On December 8, 2025, Aetna responded in writing, acknowledging Genesis's objection but unilaterally refusing to exempt Genesis, withdraw the Policy, or negotiate a modification resolving Genesis's federal-law and contractual objections. Aetna stated: "We are writing to confirm that this policy will go into effect for Genesis Healthcare System effective January 1, 2026." Although Aetna described certain changes to the Policy, including automatic higher-rate payment for stays of five or more midnights and additional review procedures, it forced implementation over Genesis's documented opposition. Aetna's response foreclosed meaningful good-faith negotiation rather than resolving the dispute.

47. Since January 1, 2026, Aetna has applied, and continues to apply, the Policy to Genesis's Medicare Advantage inpatient claims in direct violation of the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101. Aetna is paying a materially reduced, observation-comparable rate for inpatient stays of one to four midnights that Aetna unilaterally determines do not meet its MCG severity criteria, notwithstanding that: (a) the treating physician determined, and documented, that the admission was medically necessary and appropriate for inpatient status; (b) the admission satisfies the Two Midnight Rule; and (c) CMS has explicitly prohibited Medicare Advantage organizations from using MCG or similar criteria to change coverage or payment criteria established under Traditional Medicare law.

### V. *Financial and Operational Harm to Genesis*

48. Aetna's practices (including its pre-Policy pattern of inpatient denials and observation downgrades, now compounded by the Policy) have caused and continue to cause substantial financial and operational harm to Genesis.

49. In 2025, Genesis admitted 994 Aetna Medicare Advantage members for inpatient care. Within a 30-day period, 101 of those members were readmitted to Genesis, requiring $2.7 million in inpatient care; Aetna paid only $588,665 of the value of that care, leaving Genesis with an approximate $2,097,421 shortfall: Genesis forfeiting roughly 73% of expected payment on these readmission claims alone.

50. Aetna's Medicare Advantage observation-downgrade rate has run nearly twice the peer-payer average (roughly 5 of every 10 admissions downgraded to observation status, versus roughly 3 of every 10 for peer payers), with each downgrade costing Genesis approximately $7,800 and contributing to nearly $1 million in observation-downgrade losses for Genesis in 2025.

51. As of the October 31, 2025 Joint Operating Committee meeting, Genesis calculated that $18.6 million in disputed revenue was tied to Aetna contracts with Genesis.

52. Aetna processed all appeals Genesis submitted but issued payment representing only approximately 27% of the total value of the care Genesis provided in the disputed cases.

53. Genesis incurs significant, difficult-to-quantify administrative costs responding to Aetna's denial, downgrade, and severity-review practices, including an average cost of approximately $3,558 per Aetna appeal (combining third-party vendor costs of approximately $2,793 and Genesis staff payroll costs of approximately $765 per appeal), and diversion of physician advisors' and utilization-management staff's time away from direct patient care to conduct MCG severity reviews and discussions with Aetna medical directors.

54. The Policy compounds this harm because, going forward, virtually every Medicare Advantage inpatient stay of one to four midnights that Genesis's admitting physicians determine is medically necessary (even where the physician's judgment satisfies the Two Midnight Rule and Genesis's own MCG criteria) is subject to a unilateral Aetna "severity" gatekeeping determination that can result in automatic reduction to an observation-comparable rate, without a medical-necessity denial that would trigger full appeal and peer-to-peer review rights.

55. Since January 1, 2026, Genesis's admitting physicians have documented medically necessary inpatient stays satisfying the Two Midnight Rule, and Aetna "authorized" the inpatient admissions. In many instances, Aetna nevertheless applied its proprietary MCG severity criteria and paid the lower level-of-severity rate for stays that met the federal standard for full inpatient payment.

56. These injuries are ongoing, will recur with each qualifying admission for as long as Aetna continues to violate federal law by applying the Policy, and are not fully compensable in a lump-sum damages remedy. The Two Midnight Rule violation is systemic and continuing; Aetna applies the unlawful Policy to new admissions daily. Monetary relief alone cannot restore Genesis's care-management and appeal processes disrupted by Aetna's ongoing federal law violation, nor can it remedy the ongoing interference with Genesis's ability to make real-time staffing, resource-allocation, and patient-care decisions. A legal remedy at law is therefore inadequate, and declaratory and injunctive relief is necessary to enforce compliance with federal law.

57. The central question presented is a pure question of law: whether a Medicare Advantage organization may lawfully use proprietary MCG-based criteria to reduce payment for inpatient admissions that satisfy the Two Midnight Rule. That question concerns interpretation of

federal regulatory requirements and does not require factual development. The LOS Policy's violation of the Two Midnight Rule and 42 C.F.R. § 422.101 is apparent on the face of the Policy itself, which expressly applies MCG criteria to create a bifurcated payment structure for admissions that Aetna has already authorized as medically necessary inpatient stays. The parties' communications and Genesis's compliance with contractual prerequisites do not alter that threshold legal question; there are no disputed facts requiring discovery to determine whether the Policy, as written and applied, violates federal law on its face.

## CAUSES OF ACTION

### COUNT I

### Violation of the CMS Two Midnight Rule: Declaratory and Injunctive Relief

*(Federal Question: 42 C.F.R. § 412.3; 42 C.F.R. § 422.101; 42 U.S.C. § 1395w-22; 28 U.S.C. §§ 2201, 2202)*

58. Genesis incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

59. Aetna is a Medicare Advantage organization that offers Medicare Advantage plans to Medicare beneficiaries pursuant to Part C of Title XVIII of the Social Security Act and a contract with CMS. As a Medicare Advantage organization, Aetna is subject to, and must comply with, the federal Medicare Advantage regulatory framework, including 42 C.F.R. § 422.101 (requiring Medicare Advantage organizations to provide coverage of all services covered by Part A and Part B and to comply with CMS national coverage determinations) and 42 C.F.R. § 412.3 (the Two Midnight Rule, defining when inpatient admissions are appropriate for payment under Medicare Part A).

60. The Two Midnight Rule, 42 C.F.R. § 412.3, is a Medicare coverage criterion that defines when an inpatient admission is appropriate for payment under Medicare Part A. As CMS

confirmed in the 2023 Final Rule, 88 Fed. Reg. 22,120, 22,189 (Apr. 12, 2023), Medicare Advantage organizations "may only apply coverage criteria that are no more restrictive than Traditional Medicare coverage criteria." The Two Midnight Rule is a Traditional Medicare coverage criterion, and Medicare Advantage organizations may not apply criteria more restrictive than the Two Midnight Rule to inpatient admissions.

61. Aetna's Level of Severity Inpatient Payment Policy violates the Two Midnight Rule and 42 C.F.R. § 422.101 by applying MCG-based "severity" criteria that are more restrictive than the Two Midnight Rule to reduce payments for Medicare Advantage inpatient admissions that satisfy the federal Two Midnight Rule. CMS has explicitly prohibited this conduct, stating that "MA plans may not use InterQual or MCG criteria, or similar products, to change coverage or payment criteria already established under Traditional Medicare laws." 88 Fed. Reg. at 22,194. Aetna's Policy does exactly what federal law prohibits.

62. As a direct and proximate result of Aetna's violation of the Two Midnight Rule and 42 C.F.R. § 422.101, Genesis has suffered and continues to suffer harm, including reduced reimbursement for medically necessary inpatient services that satisfy the Two Midnight Rule and substantial, ongoing administrative burden, for which Genesis has no adequate remedy at law given the continuing, recurring, and prospective nature of the federal law violation.

63. Aetna's Policy violates federal law by: (a) applying MCG-based "severity" criteria that are more restrictive than the Two Midnight Rule to reduce payment for Medicare Advantage inpatient admissions; (b) using a "payment" mechanism to accomplish what CMS has prohibited Medicare Advantage organizations from accomplishing through "coverage" determinations; and (c) structuring the Policy to avoid the formal denial procedures that would trigger CMS-mandated

administrative appeal and peer-to-peer review rights, thereby evading federal oversight of its non-compliant conduct.

64. An actual, substantial, and continuing case or controversy exists between Genesis and Aetna regarding whether Aetna's Level of Severity Inpatient Payment Policy violates the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101. This Court has authority under 28 U.S.C. §§ 2201 and 2202 to declare Aetna's Policy unlawful and to enjoin Aetna from continuing to violate federal law.

65. Genesis is entitled to declaratory and injunctive relief requiring Aetna to comply with the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101 when paying for inpatient services rendered to Aetna Medicare Advantage members at Genesis, and enjoining Aetna from applying its Level of Severity Inpatient Payment Policy, which violates federal law by applying MCG-based criteria that are more restrictive than the Two Midnight Rule to reduce payments for medically necessary inpatient admissions.

## COUNT II

### Breach of Contract: Specific Performance / Injunctive Relief

*(Derivative of Federal Law Violation; Supplemental Jurisdiction Under 28 U.S.C. § 1367)*

66. Genesis incorporates by reference the allegations in the preceding paragraphs, including the allegations regarding Aetna's violation of the Two Midnight Rule and 42 C.F.R. § 422.101, as though fully set forth herein.

67. An actual, substantial, and continuing controversy exists between Genesis and Aetna regarding whether the Policy violates the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101, and whether Aetna may lawfully apply MCG-based "severity" criteria to reduce payment for Medicare Advantage inpatient admissions that satisfy the federal Two Midnight Rule.

This federal law question is at the center of this dispute. Additionally, a controversy exists as to whether Aetna's conduct violates the Agreement's incorporation of federal law compliance obligations and whether Aetna may apply the Policy to Genesis absent a signed written amendment.

68. A valid and binding contract (the Agreement) exists between Genesis and Aetna, supported by adequate consideration. Pursuant to Section 3.2(c) of the Agreement, Aetna contractually committed to remain "substantially in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided hereunder." This contractual commitment incorporates Aetna's obligation to comply with the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101.

69. Aetna has breached, and continues to breach, the Agreement by: (a) violating its contractual commitment to remain in substantial compliance with applicable federal law, specifically by implementing and applying a Policy that violates the Two Midnight Rule and 42 C.F.R. § 422.101, as set forth in Count I; and (b) unilaterally imposing a material change to the Agreement's negotiated inpatient reimbursement rates, over Genesis's timely written objection, without a signed amendment, in violation of Section 9.1 of the Agreement. The contractual breach is derivative of and compounded by Aetna's federal law violation.

70. Genesis has performed its obligations under the Agreement, including by providing medically necessary inpatient hospital services to Aetna Medicare Advantage members in reliance on the Agreement's negotiated inpatient reimbursement terms, and by exhausting Aetna's internal dispute-resolution mechanism under Section 8.2 through its written objections, correspondence, and JOC presentations. As a direct and proximate result of Aetna's breach, Genesis has no adequate remedy at law. Aetna's continuing breach causes harms that cannot be

reversed or fully compensated by retroactive payment, including: (i) daily disruption of Genesis's care-management and utilization-review workflows, which cannot be unwound through later claim payments; (ii) systemic interference with physicians' clinical decision-making, creating patient-safety risks as physicians and their advisors are pressured to document against Aetna's proprietary severity criteria rather than focus on medical necessity under the Two Midnight Rule; (iii) reputational harm from billing patients for, or communicating to patients about, balances arising from Aetna's improper downgrades; and (iv) a continuing cash-flow deficit that, as a rural, thin-margin hospital, Genesis cannot sustain while awaiting resolution of individual claims without threatening its ability to continue serving its community. Because these harms recur with each qualifying admission and cannot be remedied through a series of claim-by-claim damages awards, Genesis is entitled to specific performance and injunctive relief requiring Aetna to comply with the Agreement and applicable federal law and enjoining Aetna from continuing to apply the Policy to Genesis.

71. Genesis has suffered and continues to suffer harm in the form of reduced reimbursement for medically necessary inpatient services and substantial administrative burden.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Genesis HealthCare System respectfully requests that this Court enter judgment in its favor and against Defendant Aetna Health Inc. and grant the following relief:

a. A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that: (i) the Two Midnight Rule, 42 C.F.R. § 412.3, and 42 C.F.R. § 422.101 prohibit Aetna, as a Medicare Advantage organization, from applying coverage or payment criteria more restrictive than the Two Midnight Rule to inpatient services rendered to Aetna Medicare Advantage members; (ii) Aetna's Level of Severity Inpatient Payment Policy

violates the Two Midnight Rule and 42 C.F.R. § 422.101 by applying MCG-based "severity" criteria that are more restrictive than the Two Midnight Rule; (iii) the Agreement requires Aetna to remain substantially in compliance with applicable federal law, including the Two Midnight Rule and 42 C.F.R. § 422.101; (iv) Aetna's Policy violates its contractual obligation to comply with applicable federal law; and (v) Aetna may not unilaterally impose the Policy on Genesis absent a signed written amendment to the Agreement;

b. A preliminary and permanent injunction pursuant to 28 U.S.C. § 2202 enjoining Aetna from applying the Level of Severity Inpatient Payment Policy to Genesis, and requiring Aetna to: (i) comply with the Two Midnight Rule and 42 C.F.R. § 422.101 when paying for inpatient services rendered to Aetna Medicare Advantage members at Genesis; (ii) pay Genesis's negotiated/contracted inpatient DRG rate for all Medicare Advantage inpatient admissions that satisfy the Two Midnight Rule, without regard to Aetna's MCG-based severity criteria; and (iii) comply with the Agreement's amendment provisions and not unilaterally modify reimbursement rates except as expressly permitted by the Agreement;

c. An order requiring Aetna to reprocess and pay at the full contracted inpatient rate all claims previously paid at the "lower level of severity rate" under the Policy since its January 1, 2026 effective date, to the extent such relief is equitable and injunctive nature and consistent with the relief available under the Agreement's arbitration carve-out;

d. An award of compensatory damages;

e. An award of costs and disbursements of this action, including reasonable attorneys' fees and expenses to the extent recoverable under applicable law;

f. Expedited consideration and hearing pursuant to Fed. R. Civ. P. 57;

g. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues in this action so triable.

October 5, 2026

Respectfully submitted,

/s/ *Maurice A. Wells*
Maurice A. Wells (0096804)
*Trial Attorney for Plaintiffs*
Epstein Becker & Green, P.C.
250 West Street, Suite 300
Columbus, Ohio 43215
T: (614) 872-2447
E: mwells@ebglaw.com

Anthony Argiropoulos (*Pro Hac Vice to be filed*)
William Gibson (*Pro Hac Vice to be filed)*
Katharine Ello (*Pro Hac Vice to be filed)*
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
281 Witherspoon Street, Third Floor
Princeton, New Jersey 08540
T: (609) 490-4860
E: aargiropoulos@bakerdonelson.com
wgibson@bakerdonelson.com
kello@bakerdonelson.com

***Counsel for Plaintiff Genesis HealthCare System***